IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Newport News Division

UNITED STATES OF AMERICA,

v.                                                    Criminal No. 4:20cr47 (DJN)

IRIS KIM, *et al.*,
         Defendants.

## MEMORANDUM OPINION

This matter comes before the Court on the sentencing positions submitted by the

Government and Defendants Iris Kim, Inc., Beyung Kim, Seung Kim, Pyongkon Pak, Dongjin

Park and Chang You (collectively, "Defendants") in advance of their sentencing hearings.  In

their positions, Defendants raise various objections to the Sentencing Guidelines ("U.S.S.G.")

calculations included in their presentence reports ("PSRs").  Specifically, (1) all Defendants

object to the method of loss calculation for their offenses; (2) Beyung Kim challenges the

applicability of a four-level enhancement pursuant to U.S.S.G. § 3B1.1 for his role in the

offense; (3) Seung Kim and Pyongkon Pak request a reduction in offense level pursuant to

U.S.S.G. § 3B1.2(b) for their respective roles in the offense; and, (4) Beyung Kim, Seung Kim

and Pyongkon Pak contest the applicability of the two-level enhancement applied to all

Defendants pursuant to U.S.S.G. § 2B1.1(b)(10).

The Court conducted an evidentiary hearing and heard oral argument on June 2, 2021,

during which the Court provided all parties with the opportunity to argue their outstanding

objections and to offer any evidence in support of their position.  For the reasons explained more

fully herein, the Court overruled Defendants' objections under § 3B1.1 and § 2B1.1(b)(10).

However, at the conclusion of the hearing, the Court took the matter of loss calculation under

advisement and ordered the parties to file supplemental briefing regarding the propriety of using U.S.S.G. § 2B1.1, Application Note 3(F)(v)(III) to calculate loss in this case. The Court also granted Seung Kim and Pyongkon Pak the opportunity to submit a supplemental filing with any exhibits that supported their § 3B1.2(b) arguments. Having reviewed the parties' positions, the Court hereby FINDS Application Note 3(F)(v)(III) applicable to the loss calculation in this case, and DENIES Seung Kim's and Pak's request for a mitigating role adjustment under § 3B1.2(b).

## I.    BACKGROUND

### A.    Defendants' Guilty Pleas and Plea Agreements

Defendants Beyung Kim and Iris Kim, Inc. (doing business as, and hereinafter referred to as "I-Tek") pled guilty to Counts One and Twenty-Six of the Indictment. ("B. Kim Agreement" (ECF No. 97); "I-Tek Agreement" (ECF No. 95)). Count One of the Indictment charges Defendants with a multi-object Conspiracy to Defraud and Commit Offenses Against the United States, in violation of 18 U.S.C. § 371. Count Twenty-Six charges Defendants with Entry of Goods by Means of False Statement, in violation of 18 U.S.C. § 542.

Beyung Kim and I-Tek also agreed in accordance with Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure that certain non-binding provisions of the Sentencing Guidelines would apply at sentencing. Specifically, Defendants Beyung Kim and I-Tek agreed that the base offense level for Count One under U.S.S.G. § 2B1.1 should be six (6) and that the Government would not seek a loss enhancement greater than eighteen (18) levels, which would result from a loss greater than $3,500,000 but less than $9,500,000.01 pursuant to U.S.S.G. § 2B1.1(b)(1)(J). (B. Kim Agreement at 3; I-Tek Agreement at 3.) The Government also agreed that it would not seek a grouping enhancement pursuant to Chapter 3, Part D, of the Sentencing Guidelines. (B. Kim Agreement at 3; I-Tek Agreement at 3.) As to I-Tek alone, the Government agreed that it

2

would not argue that U.S.S.G. § 8A1.2(b)(1) applied. (I-Tek Agreement at 3.)

Defendants Seung Kim, You, Pak and Park pled guilty only to Count One of the Indictment, which alleged a multi-object Conspiracy to Defraud and Commit Offenses Against the United States, in violation of 18 U.S.C. § 371. ("You Agreement" (ECF No. 84), "Pak Agreement" (ECF No. 86), "S. Kim Agreement" (ECF No. 89), "Park Agreement" (ECF No. 91).) In accordance with Rule 11(c)(1)(B), the Defendants agreed that certain non-binding provisions of the Sentencing Guidelines would apply at sentencing. Specifically, they agreed that the base offense level for Count One under U.S.S.G. § 2B1.1 should be six (6). (You Agreement at 3; Pak Agreement at 3; S. Kim Agreement at 3; Park Agreement at 3.) Additionally, as to Defendants Park and You, the Government agreed that it would not seek a loss enhancement greater than eighteen (18) levels, which would result from a loss greater than $3,500,000 but less than $9,500,000.01, pursuant to U.S.S.G. § 2B1.1(b)(1)(J). (You Agreement at 3; Park Agreement at 3.) As to Defendants Seung Kim and Pak, the Government agreed that it would not seek a loss enhancement greater than sixteen (16) levels, which would result from a loss greater than $1,500,000 but less than $3,500,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(I). (S. Kim Agreement at 3; Pak Agreement at 3.) Defendants also reserved their right to request a variance.

Following their guilty pleas, all Defendants objected to the Sentencing Guidelines calculations performed by their Probation Officer in accordance with these Agreements.

**B.    Factual Background**

As detailed in Defendants' PSRs and their Statements of Facts, Defendants Seung Kim, Pak, Park and You worked for Defendant I-Tek, a privately-held corporation based in Hampton, Virginia. (Pak SOF (ECF No. 87) ¶ 1; S. Kim SOF (ECF No. 90) ¶ 1; Park SOF (ECF No. 92)

¶ 1.) Defendant Beyung Kim acted as the sole owner and controlling manager and principal of I-Tek. (I-Tek SOF (ECF No. 96) ¶ 1; B. Kim SOF (ECF No. 98) ¶ 1.) From approximately 2011 to 2018, I-Tek's primary business consisted of contracting with various government agencies "as a supplier of various products and merchandise, to include non-technical, non-combat clothing, promotional items, equipment and other materials." (I-Tek PSR (ECF No. 123) ¶ 1; I-Tek SOF[1] ¶ 2.) In so contracting, I-Tek was subject to the requirements of certain set-aside programs and domestic and foreign sourcing regulations pursuant to the Buy American Act ("BAA"), the Berry Amendment and the Trade Agreements Act ("TAA"). (I-Tek PSR ¶¶ 4, 8.) As discussed more fully below, these acts set various requirements for who may obtain government contracts and from which country they may source the goods to fulfill those contracts.

As part of their conspiracy, I-Tek and the other Defendants violated these requirements as to a number of these contracts "by engaging in fraud related to [the] procurement of the contract[s] under a set-aside program and/or by sourcing merchandise from China and concealing" the origins of the merchandise from the Government and its contracting agencies. (I-Tek PSR ¶ 4; I-Tek SOF ¶ 4.) For certain contracts, Defendants falsely portrayed I-Tek as a service-disabled, veteran-owned small business ("SDVOSB"), so as to attain eligibility for certain contracts under the SDVOSB set-aside program. (I-Tek PSR ¶ 9; B. Kim SOF ¶ 9.) Specifically, Defendants identified "Individual #2," a retired federal employee and service-disabled veteran, as "president" of I-Tek on certain annual reports, when Individual #2 actually "exercised no operational leadership or day to day control over the affairs" of I-Tek. (I-Tek PSR

---

[1]     The basic admissions concerning the course of Defendants' scheme prove substantively the same in all of the other Defendants' Statements of Fact. Therefore, for these basic, background facts, the Court will only cite to I-Tek's Statement of Facts, but will cite to the other Defendants' Statements of Fact for admissions specifically relevant to them.

¶ 17; I-Tek SOF ¶ 17.) Defendants also filed false certifications on the System for Award Management (SAM) in connection with several government contracts, thereby representing that I-Tek met the requirements for the SDVOSB set-aside contracts, when it otherwise did not. (I-Tek PSR ¶ 18; I-Tek SOF ¶ 18.)

For all relevant contracts, Defendants bid on and won government contracts that required them to supply products of American origin or otherwise purchase the goods from certain designated or qualifying countries, but then acquired and supplied the agencies with goods from non-compliant countries, including China. (I-Tek PSR ¶ 10; I-Tek SOF ¶ 10.) This aspect of I-Tek's scheme involved providing false documents to the contracting agencies (including supplier quotes and purchase orders) to conceal the fact that I-Tek had acquired or would acquire its products from China. (I-Tek PSR ¶11; I-Tek SOF ¶ 11.) Defendants also established a shell company — Atlantic Solar Power, Inc. ("ASP") — for the express purpose of importing their Chinese-made products and disguising the fact that I-Tek represented the true purchaser and importer of the products. (I-Tek PSR ¶ 12; I-Tek SOF ¶ 12.) Once the relevant merchandise had arrived in the United States, Defendants either failed to mark the products with an appropriate country-of-origin label or otherwise removed or altered the labels that indicated that they had sourced the merchandise from China. (I-Tek SOF ¶ 13.) Defendants even hired two independent companies to unpack the foreign products, remove the Chinese labels and replace the labels with new labels that indicated that they had been made in the United States. (I-Tek PSR ¶ 14; I-Tek SOF ¶ 14.)

Defendant Seung Kim, Beyung Kim's adopted son, began working at I-Tek in 2015 and "was involved with providing support to the managing director, the project managers and coordinating various federal government contracts that I-Tek obtained." (S. Kim SOF ¶ 3.)

Specifically, he worked as the project manager for I-Tek's United States Army Parachute T-Shirt Contract. (S. Kim SOF ¶ 3.) During his employ at I-Tek, Seung Kim received approximately $109,074 in total payments from I-Tek. (S. Kim SOF ¶ 4.)

Defendant You began working at I-Tek in 2003 as a "Project Manager." (You SOF ¶ 3.) At times, You operated through the entity Jihoon Solution, Inc. in his work for I-Tek. (You SOF ¶ 3.) During the time periods relevant to this case, You received approximately $736,464 in total payments from I-Tek. (You SOF ¶ 3.)

Defendant Pak, the brother of Beyung Kim's wife, began working at I-Tek in October 2010, and worked there until 2015 in the capacity of "Contract review/Accounting." (Pak SOF ¶ 3.) Part of his job duties involved reviewing websites to find contracting opportunities for I-Tek. (Pak SOF ¶ 29.) During his employ at I-Tek, Pak received approximately $439,696.86 in total payments from I-Tek. (Pak SOF ¶ 3.)

Defendant Park began working for I-Tek in 2006 as a "Packing and Delivery Manager." (Park SOF ¶ 3.) At times, Park operated through the entity PolarisFive in his work for I-Tek. (Park SOF ¶ 3.) During the time periods relevant to this case, Park received approximately $1,416,385.33 in total payments from I-Tek. (Park SOF ¶ 3.)

### 1. *Concertina Wire Contract*

On April 2, 2014, I-Tek was awarded Defense Logistics Agency ("DLA") contract SPE8E6-14-D-004, an indefinite-quantity contract for Barbed Tape, Concertina Wire ("concertina wire") that was subject to the TAA. (I-Tek SOF ¶ 22.) Defendant Beyung Kim had signed and submitted the original bid proposal, which contained pictures of manufacturing facilities in the United States that I-Tek did not actually own or operate. (I-Tek SOF ¶ 23; B. Kim SOF ¶ 23.) After the award, Defendant Beyung Kim also arranged for the production of

several false purchase orders and Certificates of Compliance ("CoCs"), purporting to show that I-Tek had purchased the wire from an American company, Allied Industrial Supply ("AIS"), and otherwise met all other contracting requirements. (I-Tek SOF ¶ 25; B. Kim SOF ¶¶ 25-26; You SOF ¶ 24.) Beyung Kim and You created false documentation from AIS and arranged for You's son to falsely impersonate a representative from AIS to deceive the inspectors of the concertina wire. (You SOF ¶ 27; B. Kim SOF ¶ 29.) However, Defendants, under the name of ASP, instead imported the concertina wire from China in violation of their contract. (I-Tek SOF ¶ 27.) Ultimately, due to I-Tek's failure to provide the Government with an acceptable CoC, the Government canceled the concertina wire contract before I-Tek could complete its performance, and the Government never paid I-Tek any funds related to the contract. (I-Tek SOF ¶ 29.)

### 2. *United States Army West Point Swim Trunks Contract*

On April 3, 2014, I-Tek was awarded Contract W911SD-14-P-0120 for United States Army West Point swim trunks that included six different delivery orders, had certain country of origin and set-aside restrictions, and was signed on Beyung Kim's behalf by a co-conspirator. (I-Tek SOF ¶ 33; B. Kim SOF ¶ 33.) However, rather than sourcing the swim trunks from compliant sources, I-Tek imported the products from China, routed them through ASP and orchestrated the removal of any Chinese labeling to conceal their true country of origin. (I-Tek SOF ¶ 33.) I-Tek invoiced the Government six times related to this contract, resulting in $82,647.20 in total payments. (I-Tek SOF ¶ 34.)

Defendant Pak participated in this scheme, coordinating communications and payments between I-Tek and its Chinese suppliers. (Pak SOF ¶¶ 22-23.) Defendant You was involved in attempting to source production of the swim trunks from China, interacting with Chinese suppliers and communicating about the removal of Chinese labels from the manufactured

7

products. (You SOF ¶¶ 33-34, 37-38.) Defendant Seung Kim issued various orders to the companies that I-Tek had outsourced to remove the labels from the Chinese-made goods, instructing them on how to remove the tags from the products and repackage them. (S. Kim SOF ¶ 25.)

### 3. *United States Marine Corps Contract*

On July 15, 2014, I-Tek was awarded Contract MM00263-14-D-1002 for United States Marine Corps ("USMC") promotional items. (I-Tek SOF ¶ 35.) Previously, in January 2014, Defendant Park initiated a series of emails with a USMC contract specialist regarding an interest in submitting a bid for the USMC contract. (Park SOF ¶ 23.) In March 2014, Defendant Beyung Kim signed and submitted a bid proposal for the USMC contract as "Managing Director" and "president" of I-Tek. (I-Tek SOF ¶ 36; B. Kim SOF ¶ 36.) On April 3, 2014, Defendant Park emailed the USMC contract specialist, confirming that I-Tek would source all Commercial-Off-The-Shelf (COTs) items under the contract from qualifying countries. (Park SOF ¶ 26.) On April 7, 2014, Defendant Beyung Kim submitted a completed and signed BAA and Berry Amendment matrix to the USMC, stating that all items were "Compliant with the Berry Amendment" and "would be either domestic end items or end items originating in Canada or Germany." (I-Tek SOF ¶ 37; B. Kim SOF ¶ 37.)

Defendant Pak was involved in obtaining samples from eBay of USMC products previously produced by other companies to provide to the USMC for the solicitation. (Pak SOF ¶¶ 32-36.) I-Tek later provided these samples to the USMC, claiming to have manufactured them. (Pak SOF ¶ 36.) Further, on May 19, 2014, Defendant Pak certified that I-Tek understood the applicable FAR/DAR regulations and that I-Tek constituted a woman-owned small business and a SDVOSB. (Pak SOF ¶ 37.)

In May 2015, Beyung Kim and Seung Kim traveled to China where they met with Vivienne Tu, I-Tek's China-based source contact, and visited manufacturers for products related to the USMC contract. (S. Kim SOF ¶ 30.) On August 13, 2014, Beyung Kim and Pak attended a "Kick Off Meeting" at the MCRD Parris Island Regional Contracting Office, during which the contract's country of origin restrictions were reviewed. (Pak SOF ¶ 40; B. Kim SOF ¶ 39.)

Also, after winning the bid, Defendants began communicating with one another and potential manufacturers about obtaining a Chinese supplier for the USMC merchandise. (I-Tek SOF ¶ 42; Park SOF ¶ 32; B. Kim SOF ¶ 40.) Specifically, Beyung Kim emailed a China-based supplier for a quote on USMC shirts, and on August 17-21, 2014, attended a Las Vegas MAGIC Fashion Tradeshow where he and Pak met with at least three different Chinese garment manufacturers. (I-Tek SOF ¶¶ 40-43; Pak SOF ¶ 44; B. Kim SOF ¶¶ 40-43.) Beyung Kim also emailed co-Defendants Park, Pak and You to pass along quotes from the Chinese suppliers. (I-Tek SOF ¶ 42; B. Kim SOF ¶ 42.) Both Pak and Park sent out email inquiries to various Chinese suppliers to obtain quotes for contract-related items. (Pak SOF ¶ 42; Park SOF ¶ 32.)

On September 12, 2014, Defendants Pak and Park traveled to China, and Beyung Kim later met them there. (I-Tek SOF ¶ 46; Pak SOF ¶ 46; B. Kim SOF ¶ 46.) In October 2014, Pak assured the USMC contracting specialist that the contracted-for products would be "from a qualifying country or USA made" after the specialist expressed concerns about I-Tek's compliance with its contractual obligations. (Pak SOF ¶ 47.) On November 20, 2014, I-Tek executed purchase orders with two Chinese companies for goods that Beyung Kim had previously advised would be sourced domestically to USMC. (I-Tek SOF ¶ 48.)

Beginning in early January 2015, Defendants, including Pak, made a number of wire transfers through the Bank of China to pay for the Chinese-made goods and organized the

delivery of the goods to the United States. (I-Tek SOF ¶¶ 51-54; Pak SOF ¶¶ 49, 51.) In January 2015, Park sent emails to one of I-Tek's China-based suppliers, confirming that one of I-Tek's orders needed to be shipped in blank boxes. (Park SOF ¶ 38.) In February 2015, Pak emailed Tu regarding Chinese-made mugs, instructing her to "Please make sure there will be no 'Made in China' or Chinese character on the carton." (Pak SOF ¶ 50.)

In April 2015, Beyung Kim emailed Tu with Defendant Seung Kim copied to discuss techniques for removing the tear away "Made in China" tags attached to their China-made products and the labeling of the goods. (I-Tek SOF ¶¶ 55-60; B. Kim SOF ¶¶ 55-60.) Specifically, Beyung Kim stated: "If possible do not let them know why we are doing this and what we are trying to get at. Of course, they can pretty much guess but even so try to maintain the hum. What we are doing is accumulating 'KNOW HOWS' and should be kept only within ourselves." (I-Tek SOF ¶ 56; B. Kim SOF ¶ 56.)

On June 27, 2016, I-Tek re-certified that all contracted-for items would be compliant domestic end products or end items originating in Canada or Germany. (I-Tek SOF ¶ 61.) However, I-Tek, through ASP, proceeded to import the products from China in violation of their USMC contract, remove the Chinese labels and relabel them as "Made in the USA" before delivering them to the USMC. (I-Tek SOF ¶ 62.) I-Tek received $6,726,462.79 in total payments in connection with this contract. (I-Tek SOF ¶ 35.)

### 4.    *United States Coast Guard Wire Rope Contract*

On July 28, 2015, I-Tek was awarded contract HSCG84-15-D-BB8074 to provide wire rope to support the United States Coast Guard ("USCG") buoy tender cutter operations, a contract subject to the requirements of the TAA. (I-Tek SOF ¶ 63.) Defendants Beyung Kim and You participated in the execution of this contract. (You SOF ¶¶ 41-50; B. Kim SOF ¶¶ 63-

69.) As with prior contracts, I-Tek submitted a bid proposal that falsely stated that I-Tek had distribution facilities in California, Virginia, Texas and New Jersey, and included pictures of facilities that I-Tek represented that they owned but in fact did not. (I-Tek SOF ¶ 64.) Additionally, Defendants provided the USCG with a letter signed by Beyung Kim, stating that I-Tek intended to source the wire rope from the Republic of Korea, a TAA compliant country. (I-Tek SOF ¶ 65.) When USCG later requested clarification regarding the country of origin, Beyung Kim responded that I-Tek would source the rope from Canada and Korea, but also stated that I-Tek did manufacture some of its metal products in Virginia and Nevada. (I-Tek SOF ¶ 66; B. Kim SOF ¶ 66.) However, Defendants proceeded to import the wire rope from China and falsely stated to Customs that ASP constituted the importer of record on the Customs Entry documentation. (I-Tek SOF ¶¶ 67-68.) I-Tek received $918,271.40 in total payments in connection with this contract. (I-Tek SOF ¶ 69.)

### 5.    *United States Army Parachute Contract*

On April 29, 2015, I-Tek obtained Contract W9124D-15-P-0149, a 100% SDVOSB set-aside contract, which required the production of 1,000 U.S. Army "Golden Knights" Parachute Team promotional t-shirts that complied with the BAA. (I-Tek SOF ¶ 70; B. Kim SOF ¶ 70.) Seung Kim communicated with the Army's contracting officer both before and after the award of the contract, assuring him that the country of origin for the shirts was the United States and affirming that I-Tek constituted an SDVOSB. (S. Kim SOF ¶¶ 37-43.) Seung Kim also certified in SAM that I-Tek constituted an SDVOSB and that the company maintained a manufacturing facility in Virginia Beach, Virginia. (S. Kim SOF ¶ 40.) Yet, after obtaining the contract, Defendants acted to conceal the actual country of origin for the t-shirts — China — and falsely

portrayed I-Tek as an SDVOSB. (I-Tek SOF ¶ 70.) I-Tek received $7,260.00 in total payments in connection with this contract. (I-Tek SOF ¶ 72.)

### 6. *Indiana National Guard Contract*

On September 23, 2015, I-Tek was awarded contract W912L9-15-P-0231 for 30,000 Indiana National Guard recruiting t-shirts, which required that I-Tek make the t-shirts in the United States and otherwise comply with the BAA. (I-Tek SOF ¶ 75; B. Kim SOF ¶ 75.) During the bidding process, I-Tek falsely represented that they would manufacture the products in the United States, and after receiving the award, they "acted to conceal the country of origin by, among other things, engaging in the removal of labels reflecting country of origin and importing goods from China through ASP." (I-Tek SOF ¶¶ 74-75.)

Defendant Park participated significantly in the execution of this contract. He prepared I-Tek's initial bid and communicated with Tu about locating a China-based manufacturer for the t-shirts should I-Tek win the bid. (Park SOF ¶ 47.) He later advised Tu to begin production of the t-shirts after I-Tek won the bid. (Park SOF ¶ 52.) Defendant Seung Kim also participated in the execution of this contract. (S. Kim SOF ¶¶ 57, 60.) I-Tek received $141,000.00 in total payments in connection with this contract. (I-Tek PSR at 23.)

### 7. *Arkansas National Guard Contract*

On June 15, 2015, I-Tek was awarded contract W912JF-15-P-0059 for Arkansas National Guard promotional items, a 100% SDVOSB set-aside contract with BAA restrictions. (I-Tek SOF ¶ 77.) During the bidding process, I-Tek, through Beyung Kim, falsely represented that I-Tek had knowledge of the applicable BAA requirements, that I-Tek constituted an SDVOSB and that it maintained a manufacturing facilitating in Virginia Beach, Virginia. (I-Tek SOF ¶¶ 76-78.) After receiving the contract, I-Tek proceeded to import the merchandise from China using

ASP and provided false information to contracting authorities to conceal the actual origin of the goods. (I-Tek SOF ¶ 77.) Defendant You participated in the execution of this contract by engaging in discussions about the production of the items with a China-based supplier, emailing purchase orders to these Chinese companies and arranging the delivery of the items to their final destination. (You SOF ¶¶ 53, 56-57, 59.) I-Tek received approximately $124,000.00 in total payments in connection with this contract. (I-Tek SOF ¶ 79.)

### 8. *North Dakota National Guard Contract*

On May 26, 2016, I-Tek received notice of the award of contract W901UZ-16-P-0031 for North Dakota National Guard promotional items. (I-Tek SOF ¶ 83.) The solicitation notice for the contract required the bidder to comply with BAA requirements in a "Special Instruction" section of the solicitation. (I-Tek SOF ¶ 80.) Defendant You submitted a formal bid proposal on I-Tek's behalf, signed by Beyung Kim on May 5, 2016, that contained pictures of I-Tek's claimed manufacturing capabilities that were not actually owned by I-Tek, and falsely certified in response to a request for clarification from a NDNG contracting specialist that "The Country of Origin for all product is U.S.A." (I-Tek SOF ¶ 82; You SOF ¶¶ 63-64; B. Kim SOF ¶ 81.) I-Tek received approximately $159,980.00 in total payments in connection with this contract. (I-Tek SOF ¶ 83.)

### III. ANALYSIS

As noted, all Defendants object to the method of loss calculation for their offenses. Beyung Kim also challenges the applicability of a four-level enhancement pursuant to § 3B1.1 for his role in the offense, while Seung Kim and Pyongkon Pak request a reduction in their offense level pursuant to § 3B1.2(b) for their role in the offense. Beyung Kim, Seung Kim and

Pyongkon Pak also contest the applicability of the two-level enhancement applied to all Defendants pursuant to § 2B1.1(b)(10). The Court will address each challenge in turn.

## A. Loss Calculation

In their initial position papers, all Defendants object to the method used by the Government and Probation Officer to calculate loss. The Probation Officer applied the Sentencing Guidelines' Credits Against Loss Rule U.S.S.G. found in § 2B1.1, Application Note 3(E)(i) and calculated Defendants' loss as the total amount paid to I-Tek for the relevant goods less what I-Tek paid for the goods that it purchased from China. (Position of United States with Respect to Sentencing Factors ("Gov't Sentencing Mem.") (ECF No. 144) at 12.) While all Defendants object to this approach, each Defendant espouses a slightly different view of what the appropriate method should be.

Also applying the Credits Against Loss Rule found in U.S.S.G. § 2B1.1, Application Note 3(E)(i), Defendants Beyung Kim and I-Tek both argue that no loss occurred as a result of Defendants' fraud, because the Government still received goods of acceptable quality in fulfillment of their contract. (B. Kim Sentencing Mem. ("B. Kim Mem.") (ECF No. 189) at 5.) They maintain that any harm suffered by the Government here "is a harm to the *programmatic* interests of the U.S. government" rather than any *pecuniary* harm cognizable under the guidelines. (B. Kim Mem. at 15 (emphasis added).) In so arguing, these Defendants repeatedly emphasize their view that "Chinese goods are not inherently substandard," "lower quality" or "inferior" to American-made goods simply by virtue of their Chinese origin. (B. Kim Mem. at 28-29.)

Defendant You posits that the loss amount in the PSR overstates You's role in the offense and that therefore, "the gain of the individual defendants would better approximate both

culpability and loss." (You Sentencing Mem. ("You Mem.") (ECF No. 136) at 14.) Defendant

Pak also urges the Court to use personal gain to calculate loss. (Pak Sentencing Mem. ("Pak

Mem.") (ECF No. 133) at 11-12.) However, if the Court opts not to use personal gain, Pak states

that I-Tek's and Beyung Kim's method "must be used" for determining loss. (Pak Mem. at 14.)

Defendant Seung Kim presents similar arguments, contending that either personal gain or I-

Tek's and Beyung Kim's method of loss calculation should be used. (Seung Kim Sentencing

Mem. ("S. Kim Mem.") (ECF No. 138) at 24-28.) Finally, Defendant Park notes in his position

that courts have struggled with how to calculate loss in cases of procurement fraud and, as such,

depending on the approach selected by the Court, "the loss in this case could be as little as zero

or as much as the amount stated in the PSR." (Park Sentencing Mem. ("Park Mem.") (ECF No.

137) at 7.) Therefore, Park asks the Court to focus on a review of analogous cases and the

§ 3553 factors in crafting a sentence that best reflects his culpability. (Park Mem. at 6.)

It is certainly true that courts have long struggled to identify the appropriate method of

loss calculation in cases of procurement fraud, and few have even addressed the specific kind of

fraud perpetrated here. Typically, § 2B1.1(b), Application Note 3(A), the general rule of loss

calculation, sets the loss amount that dictates the applicable offense-level increase under

§ 2B1.1(b)(1). This general rule instructs the Court to calculate the pecuniary harm that resulted

from the offense, taking the greater of actual and intended loss then reducing it by "the fair

market value of the property returned and the services rendered, by the defendant or other

persons acting jointly with the defendant, to the victim before the offense was detected."

U.S.S.G. § 2B1.1 cmt. n.3(E)(i).

Although a number of courts have applied this subsection in cases of procurement fraud,

no true consensus exists among the circuits regarding the correct formula for determining "fair

market value," and courts have consequently upheld a wide range of methods for calculating it. *See United States v. Kozerski*, 969 F.3d 310, 312-13 (6th Cir. 2020) (affirming calculation of loss as difference between defendant's bids and next-lowest bids — i.e. the amount of profit a qualifying business would have received from the contract — in fraud scheme where defendant obtained government contracts by impersonating disabled veteran); *United States v. Martin*, 796 F.3d 1101, 1109-11 (9th Cir. 2015) (identifying loss as any premium paid on the fraudulently procured contract); *United States v. Nagle*, 803 F.3d 167, 183 (3d Cir. 2015) (noting that FMV "includes, for example, the fair market value of the materials supplied, the fair market cost of the labor necessary to assemble the materials, and the fair market value of transporting and storing the materials"). However, the majority of the cases applying this subsection concern fraud related solely to the defendants' qualification to compete for a government contract *at all*, rather than fraud related to the products or services provided. *See Martin*, 796 F.3d at 1103-04 (defendant fraudulently obtained government contracts by misrepresenting that she qualified for contracts set aside for disadvantaged businesses); *United States v. Harris*, 821 F.3d 589, 591-92 (5th Cir. 2016) (defendant committed wire fraud in connection with a scheme to obtain government procurement contracts set aside by the SBA for minority-owned small businesses); *Nagle*, 803 F.3d at 172-73 (defendants entered relationship with a separate qualifying company run by a person of Filipino descent that would bid for contracts as a disadvantaged business enterprise, and if he won the contract, defendants' company would perform the work).

While Defendants' fraud here related to their ability to compete for the relevant contracts, the impact of their scheme was far broader. In the first instance, Defendants' fraud affected the Government's ability to fairly evaluate the bids submitted for each contract pursuant to the complex regulatory scheme authorized by the BAA, Berry Amendment and TAA and further

detailed in the Federal Acquisition Regulation ("FAR") and Defense Federal Acquisition Regulation Supplement ("DFARS"), which ultimately resulted in Defendants wrongfully receiving approval for their foreign-made goods to enter the United States marketplace, and the Government mistakenly acquiring goods that did not comply with their contractual specifications or this regulatory scheme. But even more troubling, Defendants' actions diverted American tax dollars to one of our Nation's chief economic adversaries, China. In doing so, the ramifications of Defendants' crimes reverberate far beyond a simple dollar-counting damage analysis. Thus, the cases applying Application Note 3(A) only prove so instructive here, as the harm here cannot be readily quantified in financial terms.

However, the Guidelines also contain "Special Rules" to assist in determining loss in certain kinds of cases that apply "[n]otwithstanding subdivision (A)." U.S.S.G § 2B1.1 cmt. n.3(F). Specifically, Application Note 3(F)(v) states that:

> In a case involving a scheme in which (I) services were fraudulently rendered to the victim by persons falsely posing as licensed professionals; (II) goods were falsely represented as approved by a governmental regulatory agency; or (III) goods for which regulatory approval by a government agency was required but not obtained, or was obtained by fraud, loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services.

*Id.* cmt. n.3(F)(v). Defendants' fraud involved repeated misrepresentations that allowed them to bypass the extensive regulatory restrictions that they were subject to when bidding for, winning and performing the contracts at issue here, and the government agencies involved ultimately received goods for which regulatory approval was only acquired by fraud. Thus, as explained further below, the Court finds that subsection (III) of this Note clearly contemplates the scenario presented here by Defendants' fraud and, therefore, Defendants should receive no offset credit for the value of the goods that they provided.

## *1. The Buy American Act, Berry Amendment and the Trade Agreement Act*

By creating stringent legislative and regulatory requirements for the procurement of government-use products, domestic preference statutes such as the Buy American Act, Berry Amendment and Trade Agreement Act serve to "promote economic and national security and to help stimulate economic growth, create goods jobs at decent wages, strengthen [America's] middle class, and support the American manufacturing and defense industrial bases." Exec. Order No. 13788, 82 Fed. Reg. 18,837 (Apr. 18, 2017); *see also* Exec. Order No. 14005, 86 Fed. Reg. 7475 (Jan. 25, 2021) ("The United States Government should, whenever possible, procure goods, products, materials, and services from sources that will help American businesses compete in strategic industries and help America's workers thrive."). Additionally, the detailed sourcing requirements contained in these Acts ensure that the international economic relationships that the United States forms with other countries are carefully reviewed and result in fair, productive relationships that strengthen the United States' position as an economic competitor on the world stage. *See* 19 U.S.C. § 2502 (stating that TAA's purpose is to (1) approve and implement international trade agreements; (2) "foster the growth and maintenance" of a world-wide system of trade; (3) develop the opportunities for commerce for the United States in international trade; and, (4) "improve the rules of international trade and to provide for the enforcement of such rules . . . .").

The Buy American Act specifically provides that "only manufactured articles, materials, and supplies mined, produced, or manufactured in the United States, shall be acquired for public use . . . ." 41 U.S.C. § 8302(a)(1). This mandate shall apply unless the head of the relevant department or agency determines that the acquisition of the articles or materials from the United States proves "inconsistent with the public interest or their cost to be unreasonable." *Id.*

First enacted during the Great Depression, this Act served to protect and promote American industry and job availability for American workers during an era of economic turmoil for the Nation. 76 Cong. Rec. 1892 (1933) (statement of Rep. John J. Cochran) ("In times such as we are now experiencing let us put American labor to work on Government supplies and material."). Specifically, the BAA reflected the prevailing sentiment that the legislature should strive to protect job wages and opportunities for American workers by limiting and controlling the growing presence of foreign competition in the American market, while instituting a mechanism by which American capital would be recycled back into the American economy. 76 Cong. Rec. 2985 (1933) (statement of Sen. Ewin L. Davis) (emphasizing that another bill's adoption would "mean work for our workers" and that it would "help stem the tide of foreign competition and thus prevent further reduction of wages of the American worker"); 76 Cong. Rec. 3254 (1933) (statement of Sen. Arthur. H. Vandenburg) ("[P]rimarily it is an employment measure conceived in the notion that American money should sustain American labor in a moment of American crisis and American exigency."). Thus, when enacted, the Act set out "in general terms the intention of Congress, that the Federal Government and also contractors having to do with the Federal Government, should use American goods where possible and where it was a reasonable and proper thing to do." 76 Cong. Rec. 1894 (statement of Rep. John B. Hollister).

The BAA establishes a clear preference for domestically manufactured goods. And, through an extensive and detailed set of regulations, the FAR and DFARS provide for the implementation of this preference. *See* 48 C.F.R. §§ 25.100–105, 225.101-105, 252.225-7000. Relevant here, these regulations authorize contracting officers to acquire foreign-end products in certain specific circumstances, including when compliance with the restrictions of the BAA would prove contrary to public interest, the required goods are unavailable in the United States

or the cost of the domestic-made product proves unreasonable. 48 C.F.R. § 25.103. The FAR

provides a specific formula for determining the reasonableness of the cost of domestic products

or services when presented with both domestic and foreign offers. 48 C.F.R. § 25.105(b).

Specifically, as stated in the Business Clearance Memorandum supplied to I-Tek by the USMC:

> If there is a domestic offer that is not the low offer . . . the Contracting Officer
> must determine the reasonableness of the cost of the domestic offer by adding to
> the price of the low offer, inclusive of duty, 50 percent (in accordance with
> DFARS 225.105(b)). . . . The price of the domestic offer is reasonable if it does
> not exceed the evaluated price of the low offer after addition of the appropriate
> evaluation factor . . . .

("USMC Business Clearance Mem." (Ex. 3 to B. Kim's Sentencing Mem.) (ECF No. 189-3) at

15 (citing 48 C.F.R. § 25.105(b).) Thus, the process of evaluating and accepting bids from

companies for government contracts proves heavily regulated and requires the contracting

government agency to engage in this complex balancing process before it may accept certain

goods.

In 1979, Congress passed the Trade Agreement Act, which refined the strictures of the

BAA by allowing the President to waive the BAA's domestic preference requirement under

certain conditions outlined by the TAA. 19 U.S.C. § 2511. In part, the Act provides a way "to

encourage foreign countries to enter reciprocal government-procurement trade agreements" with

the United States, as it authorizes the president to treat products manufactured in countries that

have entered into reciprocal trade agreements with the United States — i.e. "designated"

countries — more favorably. *Acetris Health, LLC v. United States*, 949 F.3d 719, 723 (Fed. Cir.

2020). As with the BAA, the FAR also provides extensive regulatory guidance for TAA

compliance. 48 C.F.R. § 25.400 *et seq*. Relevant here, China does not appear on the list of

designated countries. 48 C.F.R. § 25.003.

Finally, the Berry Amendment, the last in this trifecta of domestic preference statutes, requires the Department of Defense to purchase certain products "grown, reprocessed, reused, or produced" in the United States. 10 U.S.C. § 2533a(a). As with the BAA, various exceptions exist for certain items, materials or procurements purposes. 10 U.S.C. § 2533a(d-h). An additional exception exists when the relevant department determines that the particular article or item sought by the agency cannot be procured in satisfactory quality and sufficient quantity, as and when needed. 10 U.S.C. § 2553a(c). The DFARS again details the implementation of these statutory mandates and provides an in-depth regulatory framework for agencies of the Department of Defense to follow when acquiring items specified by the Berry Amendment. 48 C.F.R. § 225.7002 *et seq*.

In sum, the BAA, FAA and Berry Amendment both individually and together lay the groundwork for a complex regulatory scheme that controls the procurement of government contracts like the ones at issue here. Indeed, each piece of legislation establishes the framework for the promulgation and implementation of certain regulatory barriers to market entry that each of the agencies here were required to apply before they could award the contracts to I-Tek or accept goods provided by I-Tek.

However, the policy concerns implicated by this regulatory scheme prove to be far greater and more complex than those of simpler set-aside programs such as the SDVOSB. While both serve to promote and protect American jobs, these domestic preference regulations ensure that American taxpayers' dollars are used to purchase products from other Americans or the United States' *allies*, while concomitantly preventing American tax dollars from being directed to economic rivals, such as China. And, by ensuring that American dollars will not serve to

enrich and empower America's economic adversaries, this scheme strives to promote and protect another vital concern — the national security of this country.

### 2. *U.S.S.G. § 2B1.1, Application Note 3(F)(v)(III)*

Section 2B1.1, Application Note 3(F)(v)(III) states that in cases involving a scheme in which "goods for which regulatory approval by a government agency was required but not obtained, or was obtained by fraud, loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services." U.S.S.G. § 2B1.1, cmt. n.3(F)(v)(III). In instituting this rule, the Sentencing Commission explained the rule as follows:

> [T]he definition of loss provides a special rule that includes in loss (and excludes from crediting) the value of items that were falsely represented as approved by a regulatory agency, for which regulatory approval was obtained by fraud, or for which regulatory approval was required but not obtained. The Commission determined that the seriousness of these offenses and the culpability of these offenders is best reflected by a loss determination that does not credit the value of these items. This decision reflects the importance of the regulatory approval process to *public health, safety, and confidence.*

U.S.S.G. App. C, Amdt. 617 (Nov. 2001) (emphasis added).

The Court finds this Note applicable here — through its scheme, I-Tek fraudulently represented that its foreign-made goods qualified for purchase by the relevant government agencies, and obtained approval for its goods, which allowed those goods to wrongfully enter the United States marketplace when they otherwise would have been barred by the regulatory scheme described above. And in doing so, Defendants caused American tax dollars to flow to our Nation's chief economic rival, thereby endangering our country's economic world standing and undermining national security. Consistent with the commentary to Amendment 617, it proves clear that a primary purpose of the domestic preference regulatory scheme that Defendants violated includes the promotion of public health, safety and confidence. As stated,

issues of the American public's economic health, national safety and confidence in the products used by its government and for its benefit constitute clear and vital concerns of the BAA, TAA and Berry Amendment.

The Court finds support for this position from the Seventh and Eleventh Circuits, as these circuits have found this provision applicable in somewhat analogous circumstances. In *United States v. Gionvenco*, defendants used false documentation to fraudulently obtain certification from the City of Chicago as a minority owned business ("MBE"). 773 F.3d 866, 867 (7th Cir. 2014). The City's MBE program aimed to encourage the use of MBEs by requiring companies contracting with the City to spend certain amounts of money contracting with MBEs. *Id.* By obtaining MBE status, defendants became a part of an MBE directory and eligible to receive certain expenditures that should have been contractually reserved for legitimate MBEs. *Id.* Defendants earned over $8.3 million in contracts that they otherwise would not have won. *Id.* at 868.

Pursuant to Application Note 3(F)(v), the district court determined that for sentencing purposes, the amount of loss attributable to Defendants' fraud was the full value of the contracts that they had won as a result of their fraud — i.e., $8.3 million. *Id.* at 870. The Seventh Circuit upheld the use of this application note, finding that it "appear[ed] to contemplate the scheme" perpetrated by the defendants. *Id.* Specifically, because "Application Note 3(F)(v) provides that where regulatory approval by a government agency is obtained by fraud," the loss amount shall include the full amount paid for the goods or services with no credit for the fair market value of those goods or services, and the defendants "undisputedly" obtained their MBE status from the City through fraud, the defendants' conduct proved "squarely within the scheme considered by" the note. *Id.* at 870-71.

The Eleventh Circuit reached a similar conclusion in *United States v. Bane*. There, the defendant owned and ran two companies that provided medical equipment, including portable oxygen, to Medicare patients. 720 F.3d 818, 822 (11th Cir. 2013). Medicare would reimburse providers up to 80 percent for the portable oxygen, as long as the providers had ensured that the oxygen was "medically necessary." *Id.* This required sending patients to an independent laboratory for specialized testing. *Id.* However, instead of sending patients to these independent labs, the defendant's companies, at his direction, "conducted the testing themselves and falsely represented to Medicare that they used independent labs." *Id.* at 823. To further the perceived legitimacy of his scheme, the defendant recruited two of the independent labs authorized to perform the specialized testing to stamp the results of the tests "to make it appear as if they had performed the tests." *Id.*

On appeal, the defendant objected to the district court's loss calculation for sentencing, arguing that the district court should have given him credit for the value of medically necessary oxygen provided to his patients. *Id.* at 824. The Eleventh Circuit rejected this argument and affirmed the district court, citing Application Note 3(F)(v):

> [The defendant had] obtained [Medicare's] approval by fraudulently representing that [Medicare's testing] prerequisite had been satisfied, when in fact it had not. The application note instructs that, in calculating loss for guidelines purposes, [the defendant] does not receive credit for the value of this oxygen. Hence, even those patients who received medically necessary oxygen, as well as the supplemental insurers who paid for it, sustained loss under the guidelines.

*Id.* at 824-25. And in doing so, the court emphasized that no offset credit would be appropriate, because the defendant's "fraud directly affected the approval process, thereby directly implicating Application Note 3(F)(v)(III)." *Id.* at 825 n.6. Consequently, the court concluded that the district court correctly imposed a loss enhancement that included the total value of oxygen provided. *Id.* at 825.

The Second Circuit followed a similar path in *United States v. Milstein*, 401 F.3d 53 (2d Cir. 2005). There, the court found Application Note 3(F)(v)(III) applicable to a fraudulent scheme involving the misbranding of prescription drugs that thwarted a complex regulatory scheme overseen by the Food and Drug Administration (FDA). The proof at trial established that the defendant and his conspirators had produced various drugs outside of the United States and then "stripped them of their original factory packaging, repackaged them with forged labels and packaging materials closely resembling those of drugs produced in accordance with FDA requirements for the U.S. market, and then fraudulently sold the drugs in the United States to doctors, pharmacists, and pharmaceutical wholesalers." *Id.* at 59. In sentencing the defendant, the district court rejected similar overtures as those here to give defendant "credit for the value of the products consumers received" when determining the loss amount. *Id.* at 74. Although the defendant was sentenced before the adoption of Application Note 3(F)(v)(III), the Second Circuit cited to this provision when affirming the district court, finding that "it clarified the law as it stood when [the defendant] was sentenced." *Id.*

The Court finds these cases applicable to the fraud scheme perpetrated here and follows the reasoning of these circuits. By contracting with the government agencies as they did here, Defendants knew that they were subject to an extensive regulatory scheme related to the kind, quality and character of the products that they could provide to these agencies. Yet, through their extensive efforts to evade the requirements of the regulatory scheme, Defendants directly affected the bid selection process and ensured that their goods would be wrongfully approved for market entry, thereby directly implicating Application Note 3(F)(v)(III).

Relatedly, in *United States v. Prosperi*, the First Circuit upheld the district court's application of 3(F)(v) (and found that the "amount of loss should be calculated as the total

25

amount paid by the government for the [materials provided] that failed to meet project specifications") in a scheme where the defendant knowingly provided concrete for a Boston public works project that "failed to meet project specifications and concealed that failure by creating false documentation purporting to show that the concrete provided complied with the relevant specifications." 686 F.3d 32, 34, 37 (1st Cir. 2012). This decision reflects the broad applicability of this note where the fraud did not involve a traditional "regulatory scheme" or "regulatory approval" process, but rather a set of regulations that the defendants agreed to abide by in their contract with the Government. *Id.* at 35.

While the Fourth Circuit has yet to address this specific question, the Court's decision here proves consistent with the Fourth Circuit's decision in *United States v. Brothers Const. Co. of Ohio*, wherein the court held that the correct measure of loss in a case involving the fraudulent diversion of set-aside benefits from disadvantaged businesses constituted the full value of the contract. 219 F.3d 300 (4th Cir. 2000). The court found that "there was certainly loss" associated with the defendants' fraud, because, despite the contract being fully performed, a "substantial sum of money . . . [was] not put to the intended use — to compensate [defendant construction company] Brothers for its work on the" construction project as a qualifying disadvantaged business. *Id.* at 318. Although the Fourth Circuit decided *Brothers* before the addition of Application Note 3(F)(v) or the Credits Against Loss Rule to the Guidelines, the Court finds the Fourth Circuit's unwillingness to credit work when the funds paid "were not put to the intended use," despite the work being otherwise completed as contracted-for, as valuable commentary. Likewise, Defendants here should not receive credit for products when the funds paid for those products were not actually put towards the products as contracted-for.

The Court also adds that the application of 3(F)(v)(III) does not ignore or otherwise negate Application Note 3(A)(v)(III), which discusses the application of the general rule for loss in cases of procurement fraud. U.S.S.G. § 2B1.1 cmt. n.3(A)(v)(III). The Court merely views Note 3(A)(v)(III) as the *general* rule for loss in procurement fraud cases, and 3(F)(v) as a rule addressing loss in certain *specific* cases of procurement fraud involving goods subject to regulatory approval schemes. When "a general permission or prohibition is contradicted by a specific prohibition or permission[,] . . . [t]o eliminate the contradiction, the specific provision is construed as an exception to the general one." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). And, as stated, the clear language of 3(F) also indicates that the Sentencing Commission intended the special rules to act as specific exceptions to the general rules of 3(A). *See* U.S.S.G. § 2B1.1 cmt. n.3(F) ("Notwithstanding subdivision(A) . . . .").

The Court acknowledges that the Fifth and Ninth Circuits have found Application Note 3(F)(v) inapplicable in cases involving set-aside programs. *Harris*, 821 F.3d at 605; *Martin*, 796 F.3d at 1110. Specifically, in *Harris*, the Court rejected Note 3(F)(v)(I) as irrelevant where the defendant made misrepresentations as to his compliance with an affirmative action contracting program during the performance of certain set-aside contracts. 821 F.3d at 605 n.11. Likewise, in *Martin*, the Court declined to apply Note 3(F)(v) where the defendant fraudulently obtained government contracts by misrepresenting that she qualified for programs designed to aid disadvantaged businesses when she did not. 796 F.3d at 1110.

However, these decisions and the nature of the fraud perpetrated by the defendants in these cases prove distinguishable from the issues presented here. For one, *Harris* considered (and rejected) a different subsection of 3(F)(v) — subsection (I) — and not the subsection that the Court applies in the instant case. Additionally, while both *Harris* and *Martin* involved fraud

27

related to *services* provided, neither of these cases involved fraud related to *goods* provided in fulfillment of a contract (as is at issue here).

The Court recognizes the circuit split as to the application of Note 3(F)(v)(III) to standard set-aside and affirmative action contracting programs. However, as stated, the policy considerations at play in the instant case extend far beyond those presented in these set-aside cases and implicate issues of national economic vitality and security.[2] Consequently, the impact of Defendants' fraud cannot solely be measured by strictly weighing the economic expectancy that the Government had in entering into contracts with I-Tek against the economic benefit actually received from the fraudulent goods provided. For these reasons, the Court finds that *Harris* and *Martin* provide only limited persuasive authority regarding the use of Note 3(F)(v)(III) in this case.

For these reasons, the Court finds that Application Note 3(F)(v)(III) must be applied here as the appropriate method of loss calculation, because it clearly encompasses the scheme perpetrated by Defendants. The question then becomes the loss amount attributed to each individual defendant.

The Court notes that a strong argument exists for holding all Defendants liable for the total loss caused by the conspiracy as a whole, given that the Guidelines expressly provide that a defendant who engages in jointly undertaken criminal activity is responsible for all acts and omissions "reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B); *see also, United States v. Abdulla*, 632 F. App'x 98, 101 (4th Cir. 2015)

---

[2]     And, as Defendants themselves note, when other issues of national health and safety are at play — such as those presented by the FDA's regulation of drugs — Note 3(F)(v) clearly applies. (Defs.' Br. Regarding Loss Valuation ("Defs.' Supp. Br.") (ECF No. 177) at 4-5 (citing *United States v. Goldberg*, 538 F.3d 280, 286 (3d Cir. 2008) (applying Note 3(F)(v) when calculating loss for misbranded drugs regulated by the FDA)).)

("Members of a conspiracy or scheme to defraud can be held responsible at sentencing for the entire foreseeable loss caused by the conspiracy or scheme."). However, invoking the rule of lenity, the Court will break in favor of Defendants on this issue and further limit foreseeable loss for each Defendant to only those contracts where each Defendant was actively or personally involved as done by the Government in its original position papers and the Probation Officer in Defendants' PSRs.

Based on the foregoing findings and providing no credit against loss for the contracts that Defendants participated in the execution of pursuant to Application Note 3(F)(v)(III), the Court hereby calculates the loss amounts for each contract as follows:

| Contract | Loss[3] |
|---|---|
| USMC | $6,206,049.31[4] |
| USCG | $918,271.40 |
| NDNG | $159,980.00 |
| INNG | $141,000.00 |
| ARNG | $124,000.00 |
| WP | $82,647.20 |
| ARMY | $7,260.00 |
| Total Loss Amount[5]: | 7,639,207.91[6] |

---

[3] The Court uses the amounts paid for each contract stated in the parties' Statements of Fact. However, even using the slightly different amounts for each contract as set forth in the Paris Affidavit, the Court would reach a similar result that would not change the applicable enhancement. And, as stated in the Guidelines, the Court need only make a "reasonable estimate of loss." U.S.S.G. § 2B1.1 cmt. n.3(C).

[4] The loss amount for this contract includes a $520,413.48 credit from the total amount paid ($6,726,462.79), because Defendants sourced a portion of these goods from the United States. (B. Kim PSR at 22; Gov't Ex. 10 at 2; Gov't Ex. 11.) The Court will not provide credit for the $13,650.00 of domestic goods provided in fulfillment of the ARNG contract, because this contract was a SDVOSB set-aside contract that Defendants obtained by fraud and, therefore, Defendants' fraud tainted all goods provided pursuant to it.

[5] This total loss amount also represents the amount of restitution owed by Defendants. 18 U.S.C. § 3663A(a)(1).

[6] The Court declines to include the value of the DLA contract in this total, because the Government terminated the contract for suspected fraud before it paid for any goods pursuant to

Against this background, the Court hereby finds the appropriate loss amount for each

Defendant to be as follows:

| Defendant | Contracts | Loss | Enhancement |
|-----------|-----------|------|-------------|
| B. Kim | All | $7,639,207.91 | +18 |
| I-Tek | All | $7,639,207.91 | +18 |
| S. Kim | USMC DO 4-6[7]; ARMY; INNG | $3,281,963.06 | +16 |
| Pak | WP; USMC DO 1-4 | $3,793,263.45 | +18 |
| Park | USMC; INNG, | $6,347,049.31 | +18 |
| You | WP; USCG; ARNG; NDNG | $1,284,898.60 | +14 |

## B.     Role in Offense (Beyung Kim)

U.S.S.G. § 3B1.1 provides that a defendant shall receive a four-level increase to his

offense level if he acted as an organizer or leader of a criminal activity that involved five or more

participants. U.S.S.G. § 3B1.1(a). However, he shall only receive a three-level enhancement if

he acted as a mere manager or supervisor. *Id.* at § 3B1.1(b). In deciding between these two

provisions, the Guidelines instruct courts to consider factors such as:

> [T]he exercise of decision making authority, the nature of participation in the
> commission of the offense, the recruitment of accomplices, the claimed right to a
> larger share of the fruits of the crime, the degree of participation in planning and
> organizing the offense, the nature and scope of the illegal activity, and the degree
> of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt. n.4.

In his sentencing position papers, Beyung Kim challenged the applicability of the four-

level increase included in his Guidelines' calculation, arguing that the Court should find that he

---

the contract. Additionally, because Application Note 3(v)(III) does not contemplate the
inclusion of any re-procurement costs in its method of loss calculation, the Court declines to
include these costs in its calculation of loss.

[7]     The values of the individual delivery orders ("DO") are also included in Government
Exhibits 10 and 11.

acted as a mere manager or supervisor, and not as a leader or organizer. However, during the June 2 hearing, Beyung Kim conceded that factual support exists in the record for the Court to sustain the four-level enhancement for his role in the offense pursuant to U.S.S.G. § 3B1.1. Instead, he simply asked the Court to exercise its discretion to find only a three-level enhancement applicable. The Court denied this request and found the four-level enhancement appropriate, given Beyung Kim's clear role as organizer and leader of I-Tek's scheme.

The record well supports this finding. Beyung Kim admitted in his Statement of Facts that he "was at all times the sole owner and controlling manager/principal of I-Tek," which included exercising primary control over "the management and day to day operations" of the company. (B. Kim SOF ¶ 3.) As to the concertina wire contract, Beyung Kim admitted that he directed a co-conspirator to create false documents to disguise the origin of the concertina wire, including a purchase order dated July 14, 2015, that purported to show that I-Tek had bought the wire from an American industrial supply company. (B. Kim SOF ¶¶ 25, 31.) Additionally, the West Point contract "was signed on defendant's behalf by a conspirator[,]" indicating that Beyung Kim had a level of decision-making authority superior to that of his co-Defendants. (B. Kim SOF ¶ 33.)

For I-Tek's largest contract, the United States Marine Corps contract, Beyung Kim played a primary role in its acquisition and execution, thereby demonstrating the organization role that he had in this scheme. Specifically, he signed the initial bid proposal under the title "Managing Director," and signed the BAA and Berry Amendment matrix, stating that all items provided to USMC were "Compliant with the Berry Amendment" and would "be either domestic end items or end items originating in Canada or Germany." (B. Kim SOF ¶¶ 36-7.)

Beyung Kim also initiated and controlled many of the communications with I-Tek's Chinese-based suppliers and I-Tek's Chinese-based employee, Tu. (B. Kim SOF ¶¶ 40-46.) Beyung Kim made certain statements via these communications, which indicate his organizational authority over the other members of the conspiracy, including an email to Tu which stated:

> If possible do not let them know why we are doing this and what we are trying to get at. Of course they can pretty much guess but even so try to maintain the hum. What we are doing is accumulating 'KNOW HOWS' and should be kept only within ourselves.

(B. Kim SOF ¶ 56.) From the language of this email, the Court infers that Beyung Kim played a primary role in planning and organizing Defendants' scheme and led others in the execution of I-Tek's fraud.

Finally, Beyung Kim importantly has close familial relationships with two of his co-Defendants — Beyung Kim is the adoptive father of co-Defendant Seung Kim and the brother-in-law of co-Defendant Pak. He recruited both individuals to work for I-Tek, a company that Beyung Kim himself founded. The level of influence and control inherent in these familial relationships, especially that between a father and a son, further solidify the Court's view that Beyung Kim constituted the clear leader of this criminal scheme and that a four-level role enhancement is appropriate.

### C. Minimal Role Adjustment: § 3B1.2(b) (Seung Kim and Pyongkon Pak)

Defendants Seung Kim and Pak ask the Court to award a four-level decrease in their offense level pursuant to U.S.S.G. § 3B1.2. This subsection of the Guidelines provides that a defendant who played a "minimal" role in any criminal activity shall receive an offense level decrease of four, while a defendant who played a "minor" role shall receive an offense level

decrease of two. U.S.S.G. § 3B1.2(a)-(b). If the defendant's actions fall somewhere in between, the Court may decrease the offense level by three. U.S.S.G. § 3B1.2.

Determining whether this adjustment applies requires a "heavily" fact-based inquiry into the totality of the circumstances, including the following "non-exhaustive" list of relevant factors:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity; (ii) the degree to which the defendant participated in planning or organizing the criminal activity; (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; (v) the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. § 3B1.2, cmt. n.3(C).

The Guidelines note that this section should apply to defendants who prove "substantially less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2, cmt. n.3(A). For example, a defendant whose loss amount under U.S.S.G. § 2B1.1 "greatly exceeds" his personal gain or who otherwise had very limited knowledge of the scope of the scheme in which he participated may receive an adjustment under this section. *Id.* Relatedly, a defendant who lacks a proprietary interest in the crime "and who is simply being paid to perform certain tasks" may qualify for an adjustment under this section. U.S.S.G. § 3B1.2, cmt. n.3(C).

Because Defendants Seung Kim and Pak did not play a minimal or even minor role in this conspiracy, the Court declines to award a decrease in these Defendants' offense levels. Regarding Seung Kim's role in I-Tek's scheme, his admissions in his statement of facts and the supplemental exhibits supplied by the Government establish that he understood the scope and structure of I-Tek's criminal activity and exercised a degree of decision-making authority, influence and planning power that renders such an adjustment inapplicable to him. As admitted

in his statement of facts, Seung Kim participated in the higher levels of I-Tek's conspiracy, "providing support to the managing director, the project managers and coordinating various federal government contracts that I-Tek obtained." (S. Kim SOF ¶ 3.) As evinced by Seung Kim's emails, from as early as 2015, Seung Kim acted under the title of a "Procurement Manager." (Gov't Ex. 20 at 1.) Additionally, Seung Kim bid on, won and served as the project manager for the Army Parachute Contract. (S. Kim SOF ¶ 3; Gov't Ex. 20 at 2.) It proves clear that Seung Kim knew about the fraud committed by I-Tek and played an active role in perpetrating it himself, given that he directly communicated with the company that I-Tek had hired to remove the labels from their China-sourced goods and arranged the removal of these labels for the West Point Swim Trunks Contract. (S. Kim SOF ¶¶ 23-24.)

Seung Kim also provided extensive support on the Marine Corps Contract and proved instrumental in securing the non-compliant goods. As admitted, Seung Kim provided product samples to Tu to aid in her search of a Chinese supplier and traveled with his father Beyung Kim to China to visit potential manufacturers of the goods. (S. Kim SOF ¶¶ 29-30.) Seung Kim took part in email exchanges with his co-Defendants regarding the labeling of the China-made goods and the instructions that they would give to the China-based factories to stitch tear-away labels onto the goods so that they could be removed once they arrived in the United States. (S. Kim SOF ¶¶ 31-34; Gov't Ex. 20 at 23, 27.) And in his role as project manager of the Army Parachute Contract, Seung Kim played an active role in certifying that I-Tek was a certified SDVOSB that maintained manufacturing facilities in the United States. (S. Kim SOF ¶ 40.)

Finally, Defendant Park describes Seung Kim as "the second most important person at I-Tek," noting that Beyung Kim only trusted him and Pak to deal with the company's financials. (Gov't Ex. 21 at 4.) This statement, in combination with the other evidence presented, reveals

that Seung Kim's role in the offense was not substantially less than the role of his co-conspirators, except for Beyung Kim who clearly played a more prominent role as president of I-Tek. Thus, the Court cannot conclude that Seung Kim proves less culpable than the average participants in this conspiracy, much less "substantially less culpable."

The same conclusion applies for Defendant Pak. Pak worked for I-Tek in the capacity of "Contracting review/Accounting." (Pak SOF ¶ 3.) As such, Pak played an active role in the planning, organization and execution of the largest contract at issue here — the Marine Corps Contract. Specifically, Pak certified in SAM that I-Tek understood the applicable FAR regulations, that I-Tek constituted a woman-owned business and that I-Tek was a SDVOSB. (Pak SOF ¶ 38.) Pak also prepared for and attended a "Kick Off Meeting" for this contract, providing a listing of personnel in advance of this meeting that falsely identified the owner of a third-party screen printing shop as a "Clothing/Garment Specialist" for I-Tek. (Pak SOF ¶ 39.) Additionally, Pak attended the Las Vegas MAGIC Fashion Tradeshow with Beyung Kim and met with Chinese companies while there. (Pak SOF ¶ 44.) And he later travelled to China with Beyung Kim in connection with this contract. (Pak SOF ¶ 46.) Pak also exchanged communications with the contract specialist for the Marine Corps, assuring the specialist that I-Tek would source the contracted-for goods from a qualifying country or the United States, while also communicating with a China-based supplier in which he instructed the supplier to ship goods to the United States through ASP. (Pak SOF ¶¶ 47-48.) Pak also made several of the wire transfers to the Chinese suppliers on behalf of I-Tek. (Pak SOF ¶¶ 49, 51.) Additionally, Government's Exhibit 19 contains numerous emails involving Pak that evince his knowledge of I-Tek's scheme, his decision-making power throughout his involvement in this conspiracy and his participation in the planning of various aspects of the fraud. (Gov't Ex. 19.)

As stated by Park, Pak "was not good at finding government contracts" and so his main duties "included contacting government representatives, suppliers, banks and accountants." (Gov't Ex. 21 at 4.) However, Pak felt that "he did most of the work on the USMC contract" and apparently had a disagreement with Beyung Kim over this issue, as he believed that he should have received more compensation than Park. (Gov't Ex. 21 at 4.) Together, these facts demonstrate that Pak knew about the scope and structure of I-Tek's criminal activity and played an active and prominent role in its execution. He played a similar role to his co-conspirators (aside from Beyung Kim), and cannot otherwise be considered "substantially less culpable" than them. Thus, the Court declines to apply the minimal/minor role adjustment to either Seung Kim or Pak.

### D.     Applicability of Sophisticated Means Enhancement

Defendants Beyung Kim, Seung Kim and Pak challenged the applicability of the two-level enhancement under § 2B1.1(b)(10), which provides for such an enhancement when "a substantial part of a fraudulent scheme was committed outside the United States; or . . . the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means . . . ." U.S.S.G. § 2B1.1(b)(10). The Court finds that both prongs of this enhancement apply here.

As to the first prong, because the Guidelines do not define "substantial," the Court looks to its plain and ordinary meaning. *Matson v. Alarcon*, 651 F.3d 404, 408 (4th Cir. 2011). "Substantial" traditionally means "important, essential, and material." *Substantial*, Black's Law Dictionary (11th ed. 2019). Thus, courts have found that for the first prong of this enhancement to apply, the scheme need not originate from outside of the United States, nor must the defendant "personally take action from outside of the United States . . . ." *United States v. Singh*, 291 F.3d

756, 761 (11th Cir. 2002); *see also United States v. Ogunbanke*, 619 F. App'x 586, 588 (9th Cir. 2015) (affirming application of enhancement where all alleged fraudulent credit card transactions occurred abroad); *United States v. King*, 623 F. App'x 962, 964, 968 (11th Cir. 2015) (affirming application of enhancement to scheme that involved sending solicitation letters to elderly victims falsely informing them that they had won the lottery, because defendant sent victims' money to another country and victims received phone calls from foreign phone numbers); *United States v. Arnaout*, 431 F.3d 994, 999 (7th Cir. 2005) (affirming application of enhancement, because even though all of defendant's racketeering activities occurred within the United States, the results of his crime occurred outside of the United States).

Additionally, the Guidelines clarify that "sophisticated means" as used in this section "means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1(b)(10) cmt. n.9(C). While the enhancement requires more than "the concealment or complexities inherent in fraud," *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014), a defendant need "not utilize the most complex means possible to conceal his fraudulent activit[y]." *United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012). "The court need only find the presence of efforts at concealment that go beyond (not necessarily far beyond . . .) the concealment inherent in . . . fraud." *Id.* (internal quotation marks omitted). Examples of such "sophisticated means" include "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." U.S.S.G. § 2B1.1(b)(10) cmt. n.9(C). The enhancement applies when the entirety of the scheme constitutes "sophisticated means," even if each individual action does not prove sophisticated. *United States v. White*, 850 F.3d 667, 675 (4th Cir. 2017); *United States v.*

*Merilia*, 640 F. App'x 239, 241 (4th Cir. 2016) ("[A] defendant's individual actions need not be sophisticated; what matters is the sophistication of the scheme as a whole.").

Defendants' conduct meets either prong of this section. For one, Defendants committed an "important, essential, and material" part of their scheme outside of the United States. Defendants frequently communicated with Chinese suppliers and traveled to China several times over the course of their conspiracy to meet with these suppliers. Defendants' co-conspirator Vivienne Tu, who remains a fugitive at this time, acted as I-Tek's representative in China and, on the company's behalf, sought out Chinese manufacturers for I-Tek's products. Additionally, Defendants frequently wired payments to their Chinese suppliers through the Bank of China. Indeed, the entire basis for Defendants' scheme involved the manufacturing and importation of merchandise from China. (B. Kim SOF ¶ 46.)

Regardless, this conspiracy even more obviously involved "sophisticated means." Defendants' calculated and long-running fraud spanned nearly a decade, and "involved several levels of fraud." *White*, 850 F.3d at 676. To perpetrate their fraud, Defendants manufactured false documentation, including fraudulent purchase orders and Certificates of Compliance, and submitted false certifications on SAM in connection with several government contracts, thereby representing that I-Tek met the requirements for the SDVOSB set-aside contracts, when otherwise they did not. Defendants also established ASP, essentially a shell entity, for the sole purpose of importing products from China and disguising the fact that I-Tek constituted the true purchaser and transporter of the products. (B. Kim SOF ¶ 12.) Given that the Guidelines "specifically include the use of corporate shells in its exemplary list of sophisticated means," the Court finds this fact alone persuasive in finding that Defendants' fraud constituted more than a mere run-of-the-mill Chinese-goods scheme. *United States v. Fife*, 471 F.3d 750, 753 (7th Cir.

2006). Indeed, Defendants did not merely rip tags out of t-shirts and replace them with new ones, but rather strove to establish a complex, multi-tiered conspiracy whereby they could fool multiple branches of the United States Government over a prolonged period of time.

For these reasons, the Court finds the application of a two-level enhancement pursuant to § 2B1.1(b)(10) appropriate for all Defendants.

## IV.    CONCLUSION

Based on these findings, the Court determines that the offense level for each defendant before application of the appropriate reductions for acceptance of responsibility should be:

| Defendant | Offense Level Before Acceptance of Responsibility |
|---|---|
| B. Kim | 30 |
| I-Tek | 26 |
| S. Kim | 24 |
| Pak | 26 |
| Park | 26 |
| You | 22 |

During the hearing on June 2, 2021, and as noted in a footnote in the Government's supplemental brief, the Government – to their credit – agrees to honor the provision in their plea agreements with each Defendant not to seek a loss enhancement in excess of a certain threshold. If the Government wishes to proceed in this fashion, it must file a motion for variance where it deems appropriate within ten (10) days of the filing of this Memorandum Opinion.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record, as well as the United States Probation Officer.

It is so ORDERED.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Date:  July 14, 2021